Howard M. REDWINE, Plaintiff in Error,

v.

Reba KING, Defendant in Error.

No. 39266.

Supreme Court of Oklahoma.

Nov. 14, 1961.

Rehearing Denied Dec. 19, 1961.

922

Howard M. Redwine, Oklahoma City, pro se, for plaintiff in error.

Holcomb & Holcomb, Buffalo, for defendant in error.

BLACKBIRD, Vice Chief Justice.

The only real estate involved in this appeal from a judgment quieting title to Harper County land is the mineral interest under four acres that has always been part of a large grass pasture containing surrounding acreage, all in the NW¼ of Section 6, Township 26 North, Range 23 West of the Indian Meridian. This four acres comprises most of the S½ E½ W½ NW¼ NW¼ of said section; however, the NW¼ NW¼ of said section has been designated as Lot "4", so that the acreage in question may be described as part of the E½ W½ of Lot 4 (in said section) or more particularly described as the South 4 acres of the E½ W½ of Lot 4, Section 6, or the South 4 acres of the West 10 acres of the East 30 acres of said Lot.

The entire NW¼ NW¼ of said Section 6, along with other land in said section, which included the Logan family homestead, was deeded to J. B. Logan by other heirs of his father, John W. Logan, deceased, in the year 1935. In 1937, the particular four acres involved here was included in a deed, describing all of the East 30 acres of the aforesaid Lot 4, conveying it and other lands from J. B. Logan to Mr. G. E. Fisher. Thereafter, one Mack Martin, an uncle of Howard M. Redwine, plaintiff in error (usually hereafter referred to as defendant) obtained title to the 4 acres, and other parcels of land in the same section, by a sheriff's deed, dated June 29, 1939, describing it as: "The South four (4) acres of the West Ten (10) acres of the East Thirty (30) acres of Lot Four (4) * *".

In 1943, a county treasurer's resale deed (dated May 10th of that year) was issued to one R. F. King. This deed's purported conveyance to said grantee of the "E½ W½ of Lot 4" in said section 6, obviously encompassed the 4 acres involved here. There is no evidence that, until this time, J. B. Logan's possession and enjoyment of this particular 4 acres, and the large pasture of which it was a part, had ever been disturbed, although he and his wife lived in another part of the county for at least 2 years immediately previous to their returning, in 1945, to live on the adjacent farm.

Near the first of November, 1946, the aforesaid Mack Martin executed and delivered to defendant, Redwine, a quitclaim deed describing 83 acres of land in the aforesaid section 6, which said description included the 4 acres in question. J. B. Logan and his wife continued to live near, and to intermittently use, the large pasture encompassing this 4 acres until sometime in 1947, when they moved to Buffalo, Oklahoma. In January of the same year, R. F. King, the tax deed purchaser, died, and, by a final decree entered in the proceedings in

which his will was probated (which decree was filed of record in June, 1949) the S½ of the W½ of the aforesaid Lot 4 was distributed to his widow, Reba King, as part of his estate.

During 1949, the J. B. Logans moved from Buffalo back to the farm. In August of that year, defendant Redwine, who had been practicing law in Oklahoma City, executed and delivered to J. B. Logan a quitclaim deed purporting to convey to Logan the surface rights in the same 83 acres of land described in Redwine's deed from Mack Martin, as aforesaid, and to reserve in himself the minerals under said land.

In March, 1954, J. B. Logan died and his widow, now Mrs. Leona Camp, moved away from the land, and, as far as the record shows, has since exercised no dominion over it, either for herself, or as agent for others, and claims no present connection with, or interest in, it.

In November, 1958, R. F. King's widow, Reba, instituted the present action to quiet her title to the 10 acres described as the E½ W½ of Lot 4, Section 4, Township 26 North, Range 23 West of the Indian Meridian, deraigning her title through her deceased husband and testate, and the aforementioned resale tax deed he purchased in 1943, as aforesaid. Mrs. King, hereinafter referred to as plaintiff, alleged not only that said resale deed was valid, but that she and her said predecessor in title had been in adverse possession of the land for more than the prescriptive period of 15 years, and the 5-year period prescribed by Tit. 12 O.S.1951 § 93(3); and that the claims of Redwine and the other defendants were barred by limitation.

In his answer, and amendment thereto, defendant Redwine based his defense primarily upon allegations of the invalidity of the aforementioned resale tax deed purchased by defendant's deceased husband, and denials that he, and/or plaintiff, had ever been in exclusive possession of the land described in plaintiff's petition, or any part thereof. More specifically, defendant alleged, among other things, that, after his predecessor in title, Mack Martin, obtained his sheriff's deed to the land involved, and, until Martin deeded it to defendant, in October, 1946, J. B. Logan recognized, acknowledged, and accepted Martin as the land's owner, and used and occupied it as Martin's tenant; that, during the remainder of the year 1946 (after October), and for the "crop year" of 1947, Logan, with Martin's consent, attorned to defendant, and used, and occupied, said tract as his (defendant's) tenant; that during the crop years of 1948 and 1949—until in August of the latter year, defendant deeded the surface to Logan—one Lewis Edmonds used and occupied the land as defendant's tenant. Defendant specifically denied that plaintiff's alleged adverse possession did, or could, extend to the tract's minerals, which is the only part of its fee-simple estate that defendant claims to now own.

At the trial, it was stipulated that there were certain defects in the aforementioned tax resale deed issued to R. F. King in 1943, and the tax resale proceedings leading up to its issuance. It seems to be tacitly conceded that these defects rendered said deed invalid, but that said deed was sufficient to constitute the "color of title" recognized as an element in establishing prescriptive title.

As showing that her deceased husband assumed possession of said land under said resale deed, Mrs. King testified that he rented it to Mr. Logan, and that she thought this occurred in 1945. One of plaintiff's witnesses, Attorney Holcomb, corroborated this generally, by testifying that "on a Sunday afternoon sometime subsequent * *" to the resale, he accompanied King to the large pasture encompassing the 10 acres, of which the subject 4 acres is a part, and helped him survey the 10 acres and drive stakes at its four corners, while J. B. Logan was there. This witness also testified that "sometime subsequent to that * * *" King leased the 10 acres to Logan; that the witness himself drew up the lease; that his "recollection" was that this was

done "* * * in the fall of 1943"; and that the lease's term was for 5 years.

Logan's widow, as a witness for plaintiff, testified, on direct examination, that her husband never owned any land in Lot 4, Section 6, Township 26, Range 23, West of the Indian Meridian, and further testified that her family recognized the E½ of the W½ of said Lot as being owned by the Kings. This witness's testimony to the effect that her husband used that 10 acres part of the time, but that he sublet it to "other people" from 1941 until he died, was consistent with the testimony of other witnesses for plaintiff, and was never refuted by defendant. Instead of supporting the allegation of defendant's Amended Answer that Lewis Edmonds rented the acreage as *his* tenant, Edmonds testified that, during the years 1947 and 1948, he rented farm land in the NW¼ of Section 6, from Logan; that he paid him cash rent on the grass in the involved pasture; that Logan told him other people owned parts of the pasture; and, that he "Logan" distributed the money to them.

There was introduced in evidence, letters that had been written by defendant to Logan indicating that in the years 1947, 1948, and perhaps the part of 1949 previous to the date of the aforementioned deed from defendant to Logan, Logan had leased from defendant that portion of the land he had purchased from Martin that was situated in the SW¼ and SE¼ of Section 6. In his testimony, defendant first affirmed his contention to be that the rent Logan paid him under this lease was for 83 acres— or the 4 acres involved here, plus 79 other acres in this same section. However, neither of his aforementioned letters to Logan identified any land under said lease as being in the *Northwest Quarter* of said Section. On cross-examination, defendant attempted to explain the failure of the first of these letters to include a description of the subject land (along with the other 79 acres) by testifying that this was an "oversight"; but he made no attempt to explain why the letter, in which he sent Logan the

lease for 1947, referred to said lease as covering only 79 acres, instead of 83. Apparently defendant had solicited rent for the grass pasture from Edmonds, but was informed that such rent was being paid to another, for, as early as July 25, 1948 (more than a year previous to defendant's purported quitclaim deed to Logan), Edmonds wrote defendant, in part, as follows:

"As to rent on grass I don't feel like it is my place to pay for it for when I moved here Mr. Logan said there were other grass in with his and he would take care of that so I have paid him the rent up to date. I am trying to get along with everybody if it is possible to do so."

Defendant testified that he knew about the tax deed to R. F. King at the time he obtained his deed from Martin; that he knew "all the time" that the Kings had been paying the taxes on the land for years, but that he never contacted them. At one place in his testimony defendant candidly admitted that he "didn't care" about this 40 acres "* * * until this law suit came up."

On the basis of the above, and other evidence not now necessary to mention, the trial court entered judgment quieting plaintiff's title, and, among other things, recognizing the tax resale deed (through which she claims) as "color of title", and specifically finding that she, and her predecessor in title, had been in actual, open, notorious, peaceable, exclusive, continuous, and adverse possession of the real estate involved, in excess of both the 5 and 15-year periods. prior to the filing of plaintiff's petition; that defendants had in no manner interfered with plaintiff's title or possession; and that defendants' claims, if any they ever had, were long since barred by limitations. After the overruling of his motion for a new trial, the defendant Redwine perfected the present appeal.

For reversal, said defendant first contends, under the heading "First Assignment of Error", that the judgment is con-

trary to law and to the evidence, because there is no direct evidence showing who was in possession of the tract in question on the date of the commencement of this action in *1958*. His contention that Keith Lauer, tenant on the Logan farm, was the last person who was shown to have used this smaller tract of pasture land, with plaintiff's consent, and that Lauer moved off of the Logan farm place in *1956*, is borne out by the record. Plaintiff does not specifically assert that her possesion, through Lauer, may be presumed to have continued, until commencement of this action in 1958, the possession begun by Logan's occupancy, under her predecessor in title; nor does she appear to place special reliance on the record showing that though a description of this 4 acres was included in the various tract descriptions appearing on Logan's aforementioned 1949 deed from defendant, Logan never claimed nor asserted ownership under it. Instead, plaintiff answers defendant's argument by relying upon the period of limitation prescribed in Tit. 12 O.S.1951 § 93(3) and (6), and the case of Gooding v. Edwards, Okl., 290 P.2d 408, 409, which case, if applicable as plaintiff interprets it, would seem to indicate that plaintiff was entitled to prevail on the basis of her and her husband's continuous and uninterrupted possession for the period between the recording of the King tax deed in 1943, and the termination of Lauer's tenancy in 1956. The tax deed in the cited case was issued in 1938, and the action commenced in 1951. There, this court said:

> "Since the trial of the instant case this court in other cases has construed and applied § 93, supra, as effective and operative to bar an action for recovery of real property held under a void tax deed, if after the recordation of the deed there has been a continuous possession of the real property under the deed for a period of five years."

Defendant contends that, under Douglas v. Mounce, Okl., 303 P.2d 430, the above-quoted rule does not apply to minerals that have been severed from the surface, after issuance of the resale tax deed and *prior* to the running, or expiration, of the period prescribed by Section 93, supra. Defendant's plain inference is that his purported severance of the minerals (he now claims) by his aforementioned quitclaim deed to Logan, occurred at such a time. Such inference is misleading. The record shows that the King tax resale deed was filed of record on June 4, 1943, whereas defendant's deed to Logan was not executed until August 5, 1949. Thus a period of more than 6 years elapsed after recordation of the tax deed; and its limitation period had elapsed under sec. 93(3) and (6), supra, before defendant ever attempted his claimed severance of such minerals. While the testimony is not specific as to just what date—after he acquired the resale deed— R. F. King surveyed and staked the boundaries, and took possession of the tract he was claiming under said deed, we think the trial court was warranted, in the absence of any evidence to the contrary, in reasonably concluding that this act of dominion and ownership occurred prior to his leasing of the land to Logan, and perhaps, as early as July, or the first of August, 1943. At any rate, such a conclusion, and the further conclusion that King thereafter held possession of the tract continuously, through Logan, for a period of at least 6 years, cannot be regarded as clearly against the weight of the evidence. Having decided, on the basis of this determination, that defendant's argument fails to show any meritorious ground for reversing the trial court's judgment upon proper application of Section 93, supra, to the facts of this case, it is unnecessary for us to discuss the applicability of the 15-year prescriptive period, or deal with any of defendant's arguments under his first three so-called propositions of law, other than those already mentioned.

Under his "Fourth Proposition of Law", it is represented that, after defendant obtained his deed from Mack Martin in 1946, J. B. Logan, as tenant, attorned to defendant, as owner of the land in question. Plaintiff points out that there is no evidence in the record to support this representation. From his argument, and citation of Tit. 41

O.S.1951 § 1, and Anoatubby v. Pennington, 46 Okl. 221, 148 P. 828, defendant seems to be of the opinion that, upon Mack Martin's acquiring title to the land by his sheriff's deed in 1939, Logan prima facie, or presumptively, became his tenant. And, under his Fifth Proposition to the effect that prescriptive title cannot be predicated on an illegal attornment, defendant contends that Logan, having presumptively at least, been Martin's tenant, he could not, under Tit. 41 O.S.1951 § 12, have thereafter become King's tenant, without Martin's consent. We find no merit in this argument. There is no evidence that Mack Martin placed Logan in possession of the land as his tenant, and we think any presumption that might otherwise have existed, that, after Martin obtained his sheriff's deed in 1939, Logan continued in possession of the land, as *his* tenant until Martin conveyed to defendant, was overcome by the evidence introduced in this case. If the record was silent as to the matter, and the case was a proper one for giving effect to such a presumption, then perhaps it might be that Logan's occupancy of the land could be regarded as attributable to Martin's ownership, and as constituting that owner's "possession", which said possession followed Martin's conveyance of the tract's title to defendant; but that is not the evidentiary situation. Therefore, the authorities cited by defendant do not apply.

■ Under the heading "Second Assignment of Error", defendant complains of the trial court's alleged error in the admission of evidence. The first such admission occurred during the direct examination of plaintiff's witness, Attorney Holcomb, after he had given the aforementioned testimony concerning his going into the "big pasture" with R. F. King and helping him survey, and stake, the 10 acre tract's four corners; and appears in the following excerpt from the record:

"Q. Would you please state whether at a later time you performed any acts for Mr. King in regard to this real estate as an attorney? A. Sometime subsequent to that I rented and leased my 10 acres to J. B. Logan and Mr. King leased his and I prepared the leases.

"Mr. Redwine: I object.

"The Court: Overruled.

\* \* \* \* \* \*

"Q. You say you drew a lease for Mr. King and Logan? A. I did.

"Q. Was it at Mr. King's instance as well as Mr. Logan's? A. At their joint request.

"Q. Did they fully execute the lease? A. They did.

"Mr. Redwine: We object as not the best evidence.

"The Court: Overruled.

"Q. Do you have that lease available? A. I do not. \* \* \*."

Defendant says that "presumably" the above objected-to testimony was admitted under Tit. 67 O.S.1951 § 64. On that assumption, he further contends, in substance and effect, that Holcomb's quoted statement that the lease was not "available" was, under the cited statute, and/or sec. 65, of the same Title, insufficient to authorize King's leasing of the land to Logan to be proved by oral testimony, rather than by introduction in evidence of the written lease itself.

■ We think defendant misapprehends the scope and applicability of the cited statutes. They were never intended to prevent such an act of ownership, or dominion, by an adverse claimant of land, from being proved by testimony. The elicitation of such testimony was not to prove the lease, or its contents, as a muniment of title, or possession, or as evidencing ownership. Its purpose was merely to prove that King claimed, and *acted,* like an owner and openly asserted the rights of one, by assuming to make of Logan his tenant, and having Logan attorn to him as the land's owner. This fact of leasing could have been established by the testimony of anyone who knew of, or witnessed, it. Furthermore, it was not necessary that such act of ownership be performed by entering into a *written* lease. An oral lease would

have been sufficient. Plaintiff positively testified that her husband collected rent for the land from Logan. The fact of Logan's holding the land (by lease) under King was more significant, for the purpose of this action, than the form, or substance, of the lease by which he held it. Nor does the fact that the lease was not recorded, or may not have been acknowledged, prevent the leasing from constituting an act of ownership, helping to establish King's possession's adverseness to the rest of the world. The invalidity of such a lease as to third persons, which defendant says is declared by Tit. 16 O.S.1951 § 15, is not decisive in a case like the present one, where, during the lease's term, its validity was never challenged nor disputed.

The rest of the defendant's argument under his "Second Assignment of Error" pertains to plaintiff's testimony concerning the lease. A portion of her direct examination is as follows:

" * * * Q. Do you know whether or not your husband rented the real estate? A. Yes, he did. He rented it to Mr. Logan. * * *."

An excerpt from the record of plaintiff's cross-examination is as follows:

" * * * Q. Mrs. King, you testified that you knew your husband rented this 10 acres to Mr. Logan in 1945. Will you tell us how you know that of your own personal knowledge. A. Because he told me he did. * * *."

Although plaintiff had testified, during her direct examination, that her husband was dead, and defendant interposed no objection to her then testifying about the lease, as soon as she testified as above shown on cross-examination, he orally moved that " * * * all her testimony along that line be stricken from the record"; and now contends that plaintiff's testimony was inadmissible as being in the category described in par. 3 of Tit. 12 O.S.1951, § 385 (amended immaterially in 1953; see Tit. 12 O.S.1955 Supp. § 385), which said statute renders it incompetent. By their specific terms, the cited statutory provisions apply only to the testimony of a husband and/or wife " * * for or against each other * * *". (Emphasis ours.) As pointed out by her counsel, when plaintiff gave the testimony in question, she was testifying neither for, nor against, her husband (who, as hereinbefore mentioned, was dead) but for *herself*. We think it obvious that the statutory provisions relied upon do not apply. Accordingly, defendant's argument fails to show error in the admission of this testimony.

As we have reached the same conclusion concerning all of the defendant's other arguments for reversal, the judgment of the trial court is affirmed.

WILLIAMS, C. J., and WELCH, HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.